May it please the Court, Adam Wolfson on behalf of Appellant AliveCor. Good morning. I'd like to reserve five minutes for rebuttal, although if the Court would like me to go over that, I'd be happy to. This is an antitrust case where the evidence shows that Apple marveled at the innovations that AliveCor created using data from the Apple Watch, calling them and those like them a magic trick. Where Apple realized those innovations were, quote, incredibly valuable, maybe more so than what the hardware costs today. Where Apple employees explained that they wanted to, quote, find creative ways to hold back that data, and Apple COO agreed. Where Apple's method of holding back that data was not a necessary consequence of any improvement to the Apple Watch, yet it completely destroyed competition in the relevant aftermarket. Well, hold on. The district court found that it was an improvement. I think Apple mentions that it saved battery, this new process, HRNN saved battery, and that they would have to create this additional reworking in order to exclude the HRPO. So why isn't that the improvement, and why isn't that sufficient for them to be successful? Thank you, Judge Mendoza. So first of all, what exactly is the relevant design change at issue in this case is itself a genuine dispute of material fact. The district court accepted and found that the relevant design change was the introduction of the HRNN algorithm. However, the evidence in AliveCor's contention is that the relevant design change was gating off of the HRNN. I don't quite see why that's a fact. I understand what you're saying, and I think maybe we should be focusing on that second one, but why is it a fact? Well, what exactly is the design change at issue? What we know from the Alston case... Well, what's at issue is whatever... I mean, if you're challenging the second one, then that's the one that's at issue. Why is it a fact? Well, Judge Berzon, I think actually you've seized on a key point here, which is that from the Alston case, from the Supreme Court, from Allied Orthopedic itself, what we have to focus on is the actual alleged restraint. And what the alleged restraint here is gating off of HRPO, and eventually the discontinuation of HRPO from the Apple Watch. So I think you're exactly focused on the right question, which is what does AliveCor allege is the problem? And what are the anti-competitive effects? I gather that in your complaints you allege that the HRPO introduction was the problem. But you're clear now that that's not what you're alleging is the problem. Well, in our complaint, we hadn't been able to look into the guts of the code and know what exactly was doing what. So in the complaint, what was alleged was that the change, this product design change, was not an improvement at the time. And what we pointed out is that there were significant... But you're not contesting that anymore. Is that right? You're not contesting whether the introduction of the new algorithm was an improvement. Oh, I see. No, we think that's irrelevant to AliveCor's claims. It's agnostic about whether or not HRNN, the new algorithm, was an improvement. As we know, the Apple Watch has seven to eight different heart rate algorithms at one time. HRNN, HRPO ran in parallel. Apple, for the first minute of every workout mode API session, toggled between them whichever of them had a higher confidence rate, heart rate, before that. And to answer your initial question, Judge Mendoza, the evidence below from Apple wasn't that it needed to take off HRPO in order to introduce HRNN. It kept it on. It used it for its own purposes. It continued to run them in parallel. Well, it had it running in the background. It used it for the first minute but had it running in the background. But I understood there never was a version where both algorithms were there and an app developer or a user could choose between them. To create something where you could choose between them would require more software development, right? The answer, Judge Friedland, to that is yes. What the evidence below, though, is from basically uncontested is that that is a very simple coding switch. A way to think about this similar to this... So I understand your expert said it's a very simple switch. But it is some coding that is required. Something that doesn't exist in the world would have to be created in the world for that to be an option, right? Yes, that is correct. And I believe that that would fall under the definition of a substantially less restrictive alternative. There is some minor de minimis cost at issue for... So the question is where does that problem fit in the analysis? Does it fit the way you just described it? It still fits at the stage of figuring out whether the product improvement immunity applies or does it just apply to the Section 2 analysis? I think that there's multiple points where this fact or where this dispute of fact comes in, Judge Berzon. That is in the product improvement analysis, the initial analysis, one of the disputes here is whether Apple's gating off of HRPO was associated conduct. And we know from Allied Orthopedic that associated conduct is the abuse or leverage of monopoly power alongside a product improvement. And in Allied Orthopedic, the reason... It's similar facts to this case where they took algorithms and put them out of reach from a third party. In that case, the product improvement itself was taking those algorithms and putting them on the monitors at issue in that case and taking them off of the sensors. Here, what we've pointed out is it wasn't necessary for them to gate off HRPO when they introduced HRPO. So your standard for associated conduct is whether it's necessary, whether it's a less restrictive alternative, is that what you're saying? No, not quite. For the associated conduct, if there is conduct that is not necessary for... It's not a necessary result of a product improvement. All right, so that's the standard you're applying, whether it's necessary. Yes, yes. So can I ask you about... I said no. I apologize. Well, what I didn't want to do is conflate the necessary consequence analysis necessarily with the substantially less restrictive alternative analysis because they might be different. But here, they're very similar. So on this necessary, so I understand you want the test to be, is it necessary to figure out whether it's part of the improvement or not. You're saying if it's not necessary to the improvement, then it's not part of the improvement. As I read Allied, it says that that one was necessary, but I don't see anywhere where it says that that is the test. Like, you want that to be the test, but I don't see Allied saying that is the whole test. And so I'd like to explore this because something could be not necessary, but it could be years of development to make it possible. And that would be... You could do it. It would take years of development. It's possible, so it's not necessary. But why should Apple... I mean, this is hypothetical. I know you say it's not that. It's very small. But say it would take a team of a thousand engineers a year of work to have it be the way you want it to be. So it's not necessary. It could be done. It's just very, very, very, very expensive and hard. Is that still your test? You're saying that, yes, if it's not necessary, they've got to do that year of many, many, many people working to create what you want. So I think that would be the hard case that is different than this case. But if there were no practical way to do this without engaging, as Your Honor has posited, thousands of engineers and millions of dollars to retain the old technology, I think that would be a situation where the necessary consequence still applies because you have the impracticality. Okay, but now we're not saying... So now we're in a practical instead of necessary. So now it's, okay, well, is it practical? I don't think it's contested here that this would require, we started with this, some engineering effort. So it's not zero. It's something. Now you say it's little. You're also saying a lot would be impractical. Now we're in a slippery slope, right? And so aren't we in some sort of, I don't know, some sort of balancing test to even figure out whether it's part of the improvement or not? I don't think... I think you need a test and you're admitting it can't be necessary. So what is the test? Well, I think the necessary consequence test actually makes sense because if what you do is you provide a new benefit, that's what Allied Orthopedic wants to protect. It states that the innovation it wants to protect is the provision of new benefits to consumers. And if you're doing something else to harm competition, that is not necessary. Right, but what we're trying to figure out, is it else? Because we're trying to figure out, is it actually the same thing? If it's part of the improvement, Allied tells us they're immune. But we want to figure out whether it's part of the improvement. So you wanted us to say necessary, but you've admitted that can't work because you need something about whether it's practical. It's got to not be necessary. It's at least something like practical. And now practical is a slippery slope of practicality from small cost to big cost. And we as a court or a jury, who figures that out and what is the standard? Well, we know from Allied itself that you can look at the intent behind the change. I'm going back to where I started from. Allied says, as to what's a very similar question, that in Section C, that it's an improvement, but it may have still violated Section 2 if any of its other conducts is anti-competitive. And they argue that it was discontinuing the older technology. So that's exactly parallel to this, right? Yes. And they treat that as a Section 2 problem. And if you treat it as a Section 2 problem, then the whole balancing is built in.  So why aren't we just doing that? We believe that's the correct result. But that's not what you said. Well, there's three separate reasons that we think the District Court erred. One is exactly what Your Honor is noting, which is that the discontinuation of old technology in a way that forces consumers to adopt new technology is itself a subject to Section 2 scrutiny. And then just as a practical matter, we eliminate the whole confusion that you were just talking about, because the balancing is built into the test at that point. I mean, if you back out this notion that there's a refusal to deal. And then we're doing something that seems to make sense. We're looking at how much trouble this actually is, and how much of an impact on competition it actually has, and where you don't need to use a bunch of words about, like, necessary or least restrictive or reasonable and so on. It just seems like a much more sensible approach. So we wouldn't need a new test. We'd just rely on allied orthopedic to apply that balancing test. That's what I understand your first argument to be. It is, Judge Mendoza. And I think here you have still all of the steps that you need to reach a monopolist who has a discontinuation of old technology that leaves consumers no choice, that forces them to use the new technology. Isn't that exactly what Allied did at this point of the analysis? It did. And regardless of whether there was a product improvement, the court, in fact, did that. But, sorry, I mean, maybe that's where we're going to end up. But that is after they decided that the improvement itself had something alongside it. And I think we have to figure out if we're talking about something alongside an improvement or the improvement itself. And that's where this practical or necessary business comes in. Because part of Allied also in the improvement itself was bad for competition, but they said that doesn't matter because that part is, I mean, that was part of the improvement. So we have to figure out, are we in the first part of Allied or the second part of Allied? And that's where this practical business was. So I'd like to just go back to that. Maybe my colleagues won't agree, but I'd like to know what the test is. Because I think you admitted it's not necessary. It's something about practical. And I'd love for you to tell me how this works. Like, how do we figure that out? Who figures it out? What does that inquiry look like? Well, so I still think that the correct test here is necessary consequence. Because in the scenario, in the hypothetical that you gave me, Judge Friedland, when it's not practical from a financial, economic, resource basis to employ an alternative design, a necessary consequence of the design that you chose that confers a new benefit to consumers is that the interoperability problem or the restraint that comes with it stems from this new design change. So would the first step that a jury here would have to figure out be, would it have been practical? I mean, your expert says it would be very easy. It's a small change. But maybe Apple will say, no, it's not practical at all. It would be hard to tell which stream you're looking at. They're going to get confused. You know, it's actually a lot of battery memory, all these things, or battery use and processing memory. That would be the first jury question. Is this practical or not? So whether it's even part of the innovation that's the improvement in the first place? I think the first jury question is, is there a product improvement? Okay, I think that's uncontested, though. You said that. So the exercise of benefits are an improvement. Well, except that it is contested whether there is a product improvement here, because Apple would like it to be that the introduction of HRNN is what the jury, the court, and everyone focus on. What AliveCor believes is the actual, and this gets back to the original question about what is the fact dispute, is that the actual question is, was it an improvement to gate off HRPO and eventually to eliminate HRPO entirely? So that in and of itself. Well, is Apple even claiming that that was an improvement? I think what they're saying, no, they're not. They're not. So why is it a question then? Well, because if the jury accepts, I see. They're claiming it is just the way they did it, it's the way they always have done it, and it would be a problem or a pain to do something else, but they're not saying it itself was an improvement. They're not claiming that gating off HRPO was an improvement. They're not claiming that discontinuing. So there's no fact question at that. Well, but what they are claiming is that introducing HRNN is an improvement that immunizes these claims from antitrust scrutiny. And they're basically saying the development of the software that was the new heart rate monitoring software that is part of this new watch is one thing. I mean, they're saying this is all one thing, and it would be much more complicated to do it a different way. And you're saying it's actually not that complicated to do it in that way, and therefore it's two things. Well, it's that, as we know from Allied, some of the questions of them trying to justify this as an improvement, we have to look behind their explanations. We have to look at whether they're pretextual. For example, they claim it's so hard to create a switch between two data streams where the device is sifting through noise and figuring out signals. All we have to do is look at AM-FM radios. AM came first. FM came later. And it's considered an improvement in terms of audio quality, things like that, but it has its own constraints, which are distribution range and interference, things like that. How have they done it for decades? There's a switch. People just... Right, but you'd like us to believe that switch is very easy, and they would like us to believe that switch within the watch, within the battery use, et cetera, is very hard. Or even if it's not very hard, it's something they shouldn't be forced to do that way because they thought of doing it the other way. And so figuring out who is right there, whether it's easy, whether it's hard, I think that has to be the first test to figure out whether it's part of the same improvement or not. Well, so going with Allied's approach to Judge Berzon's point, regardless of whether there's a product improvement, if you have the discontinuation facts, I believe that takes it outside of this question. However, on this specific question, one of the issues is that if you have any product improvement on a device and you do not examine the specific alleged restraint, the specific justification, the specific reasons why they say it's necessary to have caused a restraint, you can have any improvement become sort of the justification. Or marginal improvement. Let's say they marginally improve something over 10 years. And is that going to be enough to then, again, gate off, as you argue, the other folks? Exactly. And so to give an example from this case, with Watch OS 5, which was the OS update, the operating system update that eliminated competition in question, they introduced new watch faces. You can, on your watch, you can get new watch faces to make it look like a sports watch, like a Rolex, like a Galaxy, you know, things like that. Was that an improvement? Probably. Does that justify gating off HRPO? No, because there's no connection. So if there isn't some sort of way to analyze whether the improvement Well, hold on. Companies do this all the time. They change the size, for example, of the watch. They make it smaller or bigger, whatever. Isn't the implication of what you're asking that they would be required to keep it at the same size? Because there are third-party providers that have, you know, faces for those watches that have a specific dimension that they create, and now they've changed that. So they wouldn't be allowed to change that because, according to you, this was to gate off and have folks buy Apple faces for those. I don't think the implication is that this would open the floodgates, if that's the underlying question, Judge Mendoza, because we know that this law has been on the books for decades, decades. I can't find any case. I have to stop you there. What case tells us? I mean, I've been struggling with this case now for a month, trying to figure out how to figure out whether this is part of the improvement or not, and Allied does not tell us, I don't think. It says necessary happens if that's sufficient, but it's not necessarily necessary. Can you point to any? You can't say this is if we've lived with this rule forever because we don't have any case that talks about it. I don't mean to say that it's necessarily a model of clarity. What I mean is that these types of claims have been brought up for decades, and they're not so prevalent despite the extremely rapid pace with which technological advancement has happened over the past two, three decades. We don't see these types of claims very often because there's so many hurdles that you have to get across before you can get to a viable claim. You have to have a monopolist. You have to have, with a design change, you have to have some kind of harm to competition to first lead a plaintiff to bring a case. Your hypothetical, Judge Mendoza, you might have an increase in a watch size, but that might be a boon to third parties because they can create more intricate, better watch faces for the device. More conceptually, what the product improvement box does is back the analysis out of Section 2 once you decide that it's part of the product improvement. So the choice is between doing that or putting it into Section 2 or happening how much of the analysis gets backed out that way and putting this kind of question into a balancing through Section 2. It doesn't mean they win. You win, and maybe what probably doesn't mean you win, but it just asks the question in a different way. Well, I'm going to try to be responsive to this based on my understanding about lead orthopedic, and the cases that predate it, which is that we can't question the anti-competitive effects and pro-competitive benefits of a product improvement because that puts the court in the role of product design. However, if there are acts that surround or that are not the product improvement itself, that would be the associated conduct, and therefore those are actionable. And what you're saying here is that the gating off is that conduct. Yes. Yes, and that it also falls into this broader bucket that Judge Berzon noted, which is the discontinuation of old technology that leaves consumers with no choice but to adopt the new technology of a monopolist. And here we know that this happened because Apple's IRN has 100% market share, and those most at risk cannot use that today because if they have an AFib diagnosis, they cannot use IRN. So you've said, I think you told Judge Mendoza that what you call the associated conduct has to be, I think you said, associated with the improvement. And then at one point you said practical. So I know you don't want to say a test other than necessary, but could you try to tell us what the jury should decide? Or the judge? Again, can you just try to answer the question of what the test is to figure out whether the whole thing is the improvement or not? So we know that associated conduct is loosely defined as an abuse or leverage of monopoly power. That's not the product improvement itself. And I think that's an intentionally flexible standard. In allied orthopedic, as you noted, the reason that the conduct was not considered associated conduct is because it was a necessary consequence. Now, in terms of a different way to approach that, first of all, Apple has not identified any way. I'm going to ask them the same question. And I believe that built into allied orthopedic is that the justification for the negative conduct here is not pretextual. So it's similar to the non-pretextual business justifications aspect of the balancing test. And on the hard cases where I understand wanting to avoid a slippery slope, I believe the test would have to have some reflection of an idea that you could not practically make the alternative design that the plaintiffs are talking about for whatever reason. But here, I don't think that this is necessarily the case that requires anything other than following the exact approach. I'm sorry. I'm trying to understand your answer. Is your answer that there has to be some practicality as part of the test? That that's the test? Well, for associated conduct, the reason that necessary consequence in my mind makes sense is because if you're doing something that, for whatever reason, is not necessary for the product improvement, you're not protecting innovation. So if you pretextually add something in to a broader product improvement and say, well, this is necessary, then just because you have a product improvement, you would get just a free pass, like the Microsoft case. Microsoft updated its Windows operating system, but as part of operating the system, it deeply integrated the Windows Explorer into the operating system, and it then became a tying claim. And just because there were improvements to the operating system, Microsoft claims that this deep integration was necessary and all that, but in the end, the courts examined, well, no, this is forcing OEMs to buy the combination. It's excluding competition. Wait, wait, wait. Let's just get back. You still haven't answered this question. So you're saying the practical. You started going down the Microsoft path about the liability, but back to is it experts are going to have reports on the amount of software development and the size of the teams, and that's where it's going to be determined? Is that what you envision? I think that would be where it needs to go. Is there a legitimate, non-prejectual reason why the claimed product improvement needed to have this exclusionary side effect? But needed is how complicated. I mean, you said it. A million engineers typing at computers could do this, right? That's not what you mean, though. You mean some sort of measure of reasonability or something. Yes, Your Honor. Where in Allied is the necessary language? It's in the discussion of associated conduct, Your Honor. I looked there. I'm sure it's there, but I couldn't find it. I believe it's page either 1001 or 1002. Yes, it's page 1002, Your Honor. Okay, thank you. You started to talk about intent at one point, so I think we just got to what this is really going to look like is experts about software development talking about how hard the software development would be. But at one point you started to say something about subjective intent, so I'm wondering if you think it's not just the experts talking about how many programmers it would need or whether you think it's also something else. Yes. I think that intent – well, we know from Allied and in other cases cited in our papers that intent plays into the analysis because if – going back to Your Honor's question, original hypothetical, if you have them saying, oh, it would be so hard, so difficult, so everything, and you look into the background and you see, well, actually, like here, they say, oh, we know this is going to break their thing, or where you have admissions that the way they're doing it is not actually needed or is intended to be anti-competitive. That goes to whether there's actually product improvement. But also the pretext of this all. You previously said, well, Apple's saying it's so hard to do this. In fact, they did it. In the record, we have expert testimony from Dr. Jafari who said it's simple to create a little toggle, and Apple didn't offer expert evidence that it's hard or that it's anything other than a de minimis cost. So when you're looking at this, when I say that I think this case can largely be decided based on what is already in Allied Orthopedic on the facts, we succeed where the plaintiffs in Allied Orthopedic fail based on the analyses that the panel in Allied Orthopedic. Back to her question then. What you're saying is, so that I understand, if we have to create a test, we're putting you in the position that we perhaps may be in where we have to develop a test here. And if that test is, there's some practical part of it, but there's also subjective that we have to look behind what was the intent of the improvement or of the conduct and the gating off or whatever, as you refer to it. So you believe that there should be a portion of that test to be a subjective intent? It's not that I think it's necessary. I think that it can inform the analysis, Judge Mendoza, where it's evidence that can contribute to the finding that the claims, that the actual challenged conduct is associated conduct rather than a product improvement. So there are lots of cases that say subjective intent is kind of misleading and antitrust because people are always going to say we want to beat our competition. And there's always going to be documents that say we want to beat our competition. So I think I hear you saying, at least in this case, we don't actually need to look at the subjective emails or whatever because all we need is the experts saying it's easy. In this case, I believe that's right. However, the subjective emails certainly are relevant to the broader case. And, in fact, when we do get to gating off, when you have employees literally saying we need to find creative ways to hold back data, that certainly informs the analysis of whether this was a necessary concept. So the thing, can I just ask about that for a second? I know we have all these different ways this case goes. On the intent issue, Apple isn't, they're just selling the watch, right? They're not making any more money by beating out this AFib detection. So I don't really understand. It's like some future possible competition problem that causes this intent. Can you explain the intent issue given that they're just selling the watch and they're not actually making more money by this competition? Sure, the profit motive for doing this? Yeah. Sure. Well, so first of all, one of the pieces of evidence that we have here was Apple employees saying, if we have more competition here, we're likely to sell more watches. But the value of having more inputs for these algorithms and not having competing algorithms in this space generates massive value for the company. Health payers potentially creating subsidies for the watch, being able to utilize, create more and even better algorithms by having a larger data set, especially as we know in this day and age of AI and machine learning, more data that comes in. But if your client had its app, would they not still have the data? If they had the app, would they not still have the data? Apple would still have the data, right? Oh, I see. Well, no, because then at that point what's happening is the algorithm data is being reported to AliveCore's algorithms or to AliveCore's apps. I'm sorry, machine learning, smart rhythm is then using that data to constantly improve itself. And we actually have Apple employees talking about, if they're able to get out ahead of us, we might lose this possibility for this incredible new stream where payers are paying people to buy our watch. But all of this is like hypothetical future possible ways Apple could make money. None of them are happening. Is that right? I believe that, well, Apple completely owns this market now. So it's, I mean, the evidence in the case is that ECG and AFib detection are considered one of the main reasons to get Apple Watch now. But wait, but they don't do AFib detection. That's your whole point. No, they do have a heart rate analysis. They have intermittent heart rate and heart rhythm analysis. Their IRN feature will check in about four to six times a day only when you're at rest and only if you don't have an AFib diagnosis. If you do have an AFib diagnosis, you can't use IRN. In contrast, AliveCore's and the nascent cardiograms, they were continuous monitoring. They were constantly looking for AFib. The reason Apple is intermittent is because they sell to a broad range of age demographics. And so they want to minimize false positives. The reason AliveCore is the opposite is it's focused on the most at-risk people and therefore wants to minimize false negatives. So the continuous monitoring part of this is actually a very big deal. Apple says in its materials, we do not continuously monitor. Apple says in its materials, if you have an AFib diagnosis, do not use IRN. AliveCore is the exact opposite. And so this is what I'm saying. The idea that health care companies are going to pay them for the continuous monitoring is not happening. They're not doing it. They're not getting that money, right? So it's a future possibility that you think leads to the subjective evidence here. Well, before this happened, it absolutely was in the documents, them talking about competition with these other companies. And I'm just trying to look at some of our evidence providing where they're able, if and as it gets large enough, it morphs into a service where they said, we can't give away these algorithms. Didn't you say, didn't the record somewhere say that they are actually advertising their new service as a reason to buy the watch? Yeah, so the Apple Watch advertises the Apple Watch heart capabilities, including in particular the irregular rhythm notification feature as one of the core reasons to buy a watch. Absolutely. But that's the thing that they say is the improvement. The IRN is not what they say. Sorry, IRN, the acronyms all kind of bleed into each other. IRN, irregular rhythm notification feature, that is the competitor to a live core and cardiogram. HRNN is the algorithm that it's data is published to the workout mode API. So they are separate things. And the IRN is the product that they advertise. But HRNN is the data source for the IRN? No. They have a proprietary algorithm that provides the data for IRN. And then there's another one that's called the tachogram API that has come up in the case. But as we pointed out in the papers, if someone wanted to use the tachogram API to create their own heart rhythm analysis app on the watch OS, it does not provide continuous monitoring only four to six times a day, and you only get an alert after Apple's IRN has already provided an alert. So all you can do is provide a worse version of what Apple already provides on the watch. Okay, that's really complicated. But on your theory that this is an essential facility, it seems a little bit problematic to you that Apple seems to have products that you now just went through a whole list of things that are competing but doesn't use the thing you need that you say is essential. Well, so Apple is the one that controls access to the data that comes off the PPG sensors on the watch. It's the one who controls what the outputs are. On essential facilities, I don't – well, first of all, we don't think that this should be viewed through the refusal lens. But if the court were to view it as an essential facility, the essential facility is HRPO or an equivalent type of algorithm that, as Apple's own folks, provided effectively raw data. The HRNN is the problem because they force people to only use HRNN. Apple's proprietary algorithm is not available. The ones that it uses for IRN are not available to third parties. And then the tachygram API, what we've explained – But that's not what you're challenging. You're not asking for IRN. No, no, we're not. What we're saying is that providing a similar type of heart rate reporting as HRPO was, that was the anti-competitive act of gating that off and then taking it off eventually entirely. One last question. At some point, Apple says, as I recall, that while there are actually lots of watches and similar things now, and some of them do have these heart rhythm or could have heart rhythm apps, is that in their record or is that a fact for later in the case or what? So they – first of all, it wasn't challenged on summary judgment, not on appeal here. I think the answer is that what we have here is a relevant aftermarket watch OS heart rhythm analysis app. Well, yes, but one wonders why that would be if there are other versions and other ways to do the same thing. Well, so just to – Apple didn't challenge that we have sufficient proof of lock-in power in a relevant aftermarket. I see. But they do say this other thing. I'm sorry, which other thing? What I just described, that there are other – That there are Fitbits and other things. Yeah, and, I mean, getting – just to explain part of it, we allege that the for market, the first market is actually smartwatches and that Apple has monopoly power in the for market. So even if you look at these others, Apple still has monopoly power in the for market, and it also has monopoly power in the aftermarket. Fitbits are fitness trackers, typically, not smartwatches. So they're in a different category, and, therefore, most fitness trackers – in fact, I believe all fitness trackers don't have heart rhythm analysis capabilities. There are smartwatches that have tried to come up with some similar type – It's a short answer at this point. We're not there yet, essentially. I'm sorry? It's a short answer at this point. We're not there yet. We're not there yet, Your Honor. But the market question might be determined later, is your point? Like, you're going to argue later about whether Fitbits should be part of this market or something like that? It already has been a subject of expert discovery. We have admissible opinions from both sides. This would be something that they argue at trial at this point. Okay. I think we've asked you so many questions we should let you sit down. Well, happy to answer them. Thank you. We'll still give you five minutes of rebuttal. Thank you. You're probably going to be here for a long time, too. Thank you, Your Honor. May it please the Court, Thomas Hungar for Apple. So I think allied orthopedics actually does answer at least part of the core set of questions that the Court was asking. A live court's fundamental submission is that Apple had an obligation to, in addition to implementing the product improvement that it sought to implement and did implement, which a live court concedes is a product improvement for the purposes of the workout mode, which is to provide accurate heart rate information for people using the watch for exercise, that's a conceded improvement. They say, well, but in addition to making that improvement, which necessarily meant you're going to be providing the more accurate heart rate data from the improved algorithm, which I'm going to call HERN, versus the older, less accurate algorithm, HARPO, which meant necessarily Apple would be providing the new accurate data to the extent it was available, as opposed to the older inaccurate data. So that's the improvement. And a live court says, well, but in addition to doing that, you had an obligation to modify your software in a different way, change your architecture in order to do something that you've never done before, which is provide this additional second track. So not changing the software or the way the software operated, i.e. only giving users and app developers one set of data at a time, that's basically what you're saying? Yes. That was true before and that was true after, and that's not part of the improvement as such? It was the existing system. Correct. So, yes, the improvement operated within the otherwise existing architecture. So it wasn't that. That itself was supposed to be an improvement. The fact that workout mode always provided only one heart rate. Right. That was just the way it was. That was the way it worked. That in itself was not the improvement. The improvement was to take that feature. We provide one heart rate reading. So why can't they challenge that? The fact that you only have one set of access, and that's causing us these problems now that you have the improvement under Section 2. Why are we getting this involved in the product improvement question when it wasn't part of the product improvement? It was just how you always did things. Well, so their claim is that because you did the improvement, right, which necessarily meant we're going to provide the more accurate data instead of the less accurate data, they say you've deprived us of the less accurate data, which is valuable to us. So you have an obligation to change. Right, and they're challenging that. And they're bringing a Section 2 case saying you can't do that. And you say, oh, but, you know, we have no obligation to give you something that you don't have. And you fight it out at that level. Why are we mixing this up with the product improvement question? Because part of the product improvement here is to provide the new data. And unless Apple had an obligation to make it – But part of the product improvement was not to not provide other data. That wasn't the product improvement. Well, it was the product improvement because given the – for two reasons. Number one, as I said, given the architecture of the device, the only way they can provide the new data is to not provide the old data, unless they have an obligation to go further, which they don't. So it's the architecture of the device – I'm sorry? So it's the architecture of the device, which was there before and is there now that they're challenging. I guess you could say that. But then what they're saying is, Apple has an obligation under the law to do something it's never done before because we want it. And there's no case that says that. The answer should be no. And we do a rule – but then we get into the discussion of whether there's a refusal to deal or not. But I don't understand why we're just not going to Section 2 at that point directly instead of treating this as part of this immunity for product improvement. It was what was already there. Because what Allied Orthopedics says is that if it's inherent in the way the system works under the improved process that you created in compatibility – this is all this court's product improvement cases, Allied Orthopedic, Foremost, and CalComp. In each case, there was an improvement that also rendered legacy technology incompatible. The new technology didn't work with the old technology, just like here. So there's both a new technology and an incompatibility with the old technology. And in those cases, the court didn't say, well, we're now going to decide and let experts fight about how expensive it would have been to modify your new product further. But Allied actually did do that. I'm sorry? But Allied actually did do that. No, Your Honor. I'm sorry. No, it didn't. It said that as to the discontinuation, it can violate Section 2 if it effectively forces a consumer to adopt its new technology. But it didn't. And then it goes on to say that in another paragraph, that plaintiff's argument that Tyco could have made its monitors compatible also fails. It's a separate argument. And that has to do with the actual product improvement, i.e., how are these new monitors going to operate? But as to the discontinuation of its old technology, it just talked about Section 2 and said, but it didn't actually happen, so it's not a problem. Well, so two responses to that, Your Honor. Number one, I think what we've just been talking about here was the argument that Allied Corp makes that Apple had an obligation to modify its product in order to keep providing or to provide this second stream of data, right? That's their claim. And what Allied Orthopedics says is presented with precisely the same argument, they said, right? As you pointed out, plaintiff argued Tyco could have made its monitors compatible with the old sensors. And that argument failed, not because they said, oh, well, that would be too expensive, and the expert evidence says it would cost $50 million versus $5 million. They said, our precedents make clear that a monopolist has no duty to help its competitors survive or expand when introducing an improved product design. That's exactly this case. It's on all fours. And that's why their argument fails. You know, if we take sort of this, you know, 1,000-foot view of what's happening here, and if we really think about what Apple has done. Apple has said, you know, here we have this great product. Here come you third-party providers. Make improvements. Provide additional things. And then once they start using that, and at least they would argue that once they do something that's profitable, Apple sees that and then tries to create their own product and then gate off these third parties. Isn't there something inherently wrong? And exactly at the core of what the anti-competitive case law tells us that we're supposed to prevent. Well, no, Your Honor, for a couple of reasons. Number one, again, the product improvement doctrine recognizes that there are going to be circumstances where a product improvement renders competitors' products incompatible. I mean, that's all the cases that are cited in the briefs that we talk about, and yet the court says that doesn't matter as long as it actually is a product improvement, which it's conceded that this is. And again, it's undisputed that what they're saying is not that the product improvement itself didn't entail bringing in the new algorithm as opposed to the old. It obviously did. What they're saying is, well, you needed to do something else. So this is not a case of other conduct, associated conduct, that the defendant engaged in that blocked their ability to compete. It's a case where the actual improvement itself meant that you're going to be providing the new data, therefore not the old data, and that means that they suffer their injuries. So oddly enough, kind of ironically, instead of associated conduct, which would be like Apple did something in addition to the product improvement in order to deny them access to something but for this additional conduct that they would have had access to, they're saying, no, no, Apple actually had an obligation to engage in additional conduct beyond the improvement itself in order to benefit us. And that's exactly what all these court cases are about. But what about Jitreeland's set of questions regarding, you know, this might be an improvement, but maybe it's happening sort of marginally, right? There's some improvement, but, you know, maybe it's a way to sort of exclude other folks if there's some marginal improvement in this thing. It's a way to exclude these other groups, so long as there's this marginal improvement. In Allied, that was the claim. In fact, there was actual evidence of actual anti-competitive intent there, unlike here. And the court said that didn't matter. There was a dispute about whether the improvement was really that successful. The plaintiff argued, oh, it doesn't really accomplish their goals, and they've had second thoughts about how useful it is and it's not really more accurate. But the court said it doesn't matter as long as there is, quote, some benefit, close quote. That constitutes an improvement, and, therefore, the improvement is immune from antitrust challenge. And that's the same here. Here, it's far stronger. It's far more clear that this new technology is vastly superior. It's more accurate. It provides more frequent data, so there are fewer gaps. And it also saves money for Apple because it doesn't have to keep coding for new forms of exercise. So it's a benefit in many different ways. So what is your test for whether the improvement captures all of it or whether there's something else? Can you answer the questions I was asking the other side? Is it do you want it to just be they happen at the same time is enough? Or what is your test? It has to be, you know, you could use different words. But if it is part of the improvement itself, if it follows logically from the improvement itself, as opposed to some additional step, it qualifies as the improvement. Okay. Let me ask that. Okay. Sorry. Finish what you were going to say. Well, I was going to give an example. In the Novell case from the Tenth Circuit that then-Judge Gorsuch wrote, there, Microsoft improved its Windows software. And as part of that improvement, they said, we're going to stop giving competing app developers access to APIs that would enable them to compete with our APIs using the Windows ecosystem. And the court did not analyze that as a product improvement case. Why? Because the gating off, the blocking of access to the APIs was not in any way part of the improvement. It was just a separate act to block that off. Similarly, Microsoft in the Microsoft case from the D.C. Circuit, when they came out with a new version of their software and they incorporated their browser, their Internet browser, and they made three steps. I don't understand the technology, but they did three things designed to block people from switching to competing browsers. And the court analyzed each of those three things, and they said two of them were not improvements. They were not necessary. They were just purely designed to block competitors. They didn't provide any benefit. They weren't part and parcel of the-  I don't want to go all the way down to what Microsoft was about. Back to this test. So you're saying it's really part of the improvement, I guess, is what you're saying. Yes. Or another way, if I could, just one other point would be, if in order to do what they're asking, it would require something beyond the improvement, right? It's clearly the improvement itself that has disadvantaged them, and they want something more, some additional fix. But it's all sort of glosses on the- So, okay. You had to program the software for the watch to give HRNN as the new heart monitoring.  In the development of that software, I mean, you chose to keep the architecture where there was just one thing being reported. But say that, you know, the week before the programmer typed that in, if they had typed in-spent exactly the same amount of time and exactly the same amount of money, they could have spent their week doing it a little differently and had to-the architecture would be different. Now there's two. It's essentially the switch that they want. In exactly the same effort and cost, no difference in battery life. I know you think those things aren't true. But say there was zero cost to just spending your week differently when you're writing the software, and now you've got the switch. Would that be still the same? Not doing the switch, would that still be part of the same improvement? So I think the court can and should rule for us regardless of how it would answer that question, because here it's perfectly clear that that's not the case at all, right? The API, the structure and architecture of the API for workout mode, is entirely separate from the algorithm that produces a certain piece of the data that is sent through the API to app developers. So just because they're improving one algorithm that provides data that's sent to HealthKit, from which the API then sends that data to developers, doesn't mean they also have to separately go out and improve the API, which- Well, okay, but my hypothetical is it would cost zero to provide both instead of just providing one. I know you think that's not true. But say it would cost zero to change the architecture. I don't think it's a question of cost, although the fact it's undisputed here, it would cost Apple something to do what they're asking, which is another reason why it has no obligation to do it. But even if it were free, the question is, if the improvement itself, as designed by the developer- Remember, the whole point of the product improvement doctrine is to avoid chilling innovation by threatening innovators with antitrust liability and triple damages every time they make a product change, and some one of- You know, there are 15,000 apps that use Workout Mode API and millions of apps on the Apple Store. If every time Apple makes an improvement, it's threatened with liability by any one of the millions of app developers who don't like the particular impact on their legacy technology resulting from that change, and can threaten triple damages by getting some expert to come in and say, oh, you could have done it a different way, that defeats the whole purpose of the product improvement doctrine, which is why we have the doctrine. All right, suppose that the watch always had HR in it. It didn't have the other one, ever. And AliveCore comes in and says, you know- Well, no, and that wouldn't work. It had- Suppose it had both of them, but it wasn't ever making the HRPA, whatever you're calling it, public. It was always in the background, all right? And in other words, it operated the way it operated at the time HRNN was introduced. And AliveCore comes in and says, you know, if we had access to the HRPO, oh, is that what it's called? You know, we can make this great product. And so by not letting us have that in the aftermarket, you're monopolizing the market and so on. And that was their claim. It had nothing to do with any product improvement. How would we- They might well lose, but suppose that's what they were arguing. So if there were no issue of product improvement, and this is obviously the second point in our brief, even if what they say were true, which it clearly isn't, that this is not part and parcel of the product improvement and instead were associated with- But you already said it's not. You already said it's just what was always the case. With respect to what they're challenging is not the fact that the workout mode API has always provided only one source of data. Their claim is not that that's the leader. As I'm thinking about it, it seems like that is what they're challenging. Well, what they're claiming, and they say this on their brief, in their brief on multiple pages, including on page 61, a live core quote is asking that Apple not be permitted to withdraw an algorithm previously available to third parties. That's their claim, and that is a refusal to deal claim if you get past the product improvement document. All right, well, I'm saying a hypothetical. When you didn't withdraw it, you just never had it, but it was always there and always possible. You never had it publicly available, but it was always there and always possible. Again, I don't think that would not be, as you described the hypothetical, if I understand correctly, that would not be a product improvement case, but it would still be a refusal to deal case, and, of course, the law is perfectly clear on that. Why isn't that where we are? Is this a refusal to deal case? If it's not a refusal to deal case, how does the rule of reason apply, et cetera? Why are we mixing this up with the product improvement part? That's what I don't get. Well, because every product improvement case that this Court has decided, or at least the three that we principally talk about, Allied Signal and Foremost and CalComp, involve product improvements that render the older technology, the competing technology, incompatible. That's exactly what we have here. And in those cases, the Court each time said the monopolist did not have the obligation Unlike in Allied. I'm sorry? In Allied, as I understand it, it was inherently incompatible. That is, if you move the – I don't quite know what they did, but they moved the sensor from one place to another, and therefore you couldn't use it anymore. But here it's not inherently incompatible. It's incompatible as the result of an earlier decision about how you're going to – outside the internal workings of the company, of Apple. It's inherently incompatible in the existing product. You have to change – you have to make a product change, just as this Court recognized could have been done in Allied. But not a product change about the product improvement, a product change about how you reveal data in general of this category of data. Well, again, in Allied, the Court recognized and the plaintiffs argued that they could have changed the product to keep providing the benefit of the improvement to the people with their technology, but also to make it compatible with others. Well, I understand that was about changing the product. That was just give us the old ones. No, no, no. Because in Tyco, what happened is that Tyco manufactured a new technology monitor, and then they also sold sensors that were compatible with that new technology, but they had intentionally designed the monitor to be incompatible with the sensors of all the competing sensor sellers. And the claim was you had an obligation, Tyco, to make additional changes in your new monitors in order to – so they could still be used with the competing legacy sensors. And this Court said no, not because it couldn't be done. They didn't analyze, you know, would it have been expensive or not, or how hard would it have been. They said you had no obligation to do that because even a monopolist – No, what they actually said was no because it was actually not anti-competitive. No, they said no because – That's what one paragraph says. The next paragraph is about something else. Well, the paragraph that I'm talking about is the one rejecting the argument that Tyco could have made its monitors compatible with the old sensors, which the Court rejected because Tyco had no obligation to help its competitors survive. That's what I'm talking about. With respect to the previous paragraph, what the Court said was, sure, you're the only company that sells compatible sensors in the aftermarket. Nobody else can compete. But nonetheless, there's no technology forcing because in the foremarket, there are other competitors. Other competitors sell different monitors with different technology. And the same is true here. Other competitors sell different wearables. And that was the question I asked at the end of your opponent's argument because I don't know where that issue is in this case at this point. It's undisputed that there are other competitors in the wearables market. And if you look at, and we said this in our brief, that there are various points in the record at pages 2032, 2036, and 2110 of the excerpt of record, Fitbit, Frontier, iRhythm, other competitors in the wearables market sell their own wearables that have heart rhythm analysis apps or features on them. So there are other options at the foremarket level, which is what this Court said in Allied was sufficient to reject that argument. But that's a completely different inquiry. It's a Section 2 inquiry about whether there's actually an effect in competition. No, I don't think so. As I understand that argument, it's an associated conduct argument. The argument is that somehow by forcing people to adopt the technology for their own sensors, that was somehow a violation and separate and apart from not covered by the product improvement doctrine. And the Court said no because people aren't forced to adopt that technology. And indeed, I would note that the technology-forcing argument in this case is far weaker than it was in Allied. Because in this case, and I think my colleague on the other side misspoke in discussing Apple's IRN technology, what they claim is the only feature that's currently in the relevant market. The IRN uses the tachogram algorithm, not the heart rate algorithm, to detect potential AFib feature. Because, again, the record is pretty clear on this, the gold standard for AFib detection is electrocardiogram because you need to measure the interval between the heartbeats. The heart rate itself doesn't tell you whether somebody's having AFib. You need to know the intervals between the heartbeats. But you don't contest that you don't provide this service for people who already have an AFib diagnosis. Correct. Their product addressed a very tiny subsection of the market. Our product addresses a much larger section of the market. It has millions of users. They claim to have 13,000. So it's a different segment of the market as they define it. That's true. But if I could just make the point that I think I was trying to make, which is in terms of the technology-forcing claim, the data that the IRN app that's in the market uses to provide its AFib alerts is the tachogram data. And Apple makes that information fully available to any app developer that wants it. And that's at pages 878 of the SDR. Counselor, I guess along with the questions that Judge Berzon was asking, I guess I'm coming back to this point, which is so long as Apple makes a marginal change, that they will then say it's an improvement. So long as they do that, isn't that just a way to ice out the competition? That's kind of what I see that they're arguing here. Well, that is the law. That is Allied. But I guess part of your question seems to imply that Apple was trying to ice out the company. Any marginal improvement? Any marginal improvement. Are you saying that Allied says that any marginal improvement is an improvement, and therefore Allied is telling us it's okay? What Allied says is it has to provide some benefit. And remember, in Allied, the plaintiff claimed that the alleged improvement really wasn't much of an improvement. But the court said it provided some benefit. So your answer to my question is yes, any marginal improvement. Is that what your argument is? Well, certainly all you need to hold to decide this case is that when it's undisputed, as my opponent has conceded, that the product improvement was in fact an improvement for the market that Apple serves, which is, again, the point of workout mode is to provide accurate information for people using the Apple Watch during workouts. It's undisputed that it is an improvement and a significant improvement. I'm not asking you that. I asked you a different question. My question was, so if there is a marginal improvement, what you're saying Allied says that that's sufficient. Well, again, I think the language in Allied is, quote, some benefit. Some benefit for consumers, close quote. Now, again, the court, to decide this case and affirm the judgment, does not need to say that even if it was trivial and insignificant, that would be sufficient. This case doesn't present that question. So who should decide that? I'm sorry? Who should decide whether or not it is some improvement? Should that be a jury? Should that be the judge? Who should decide whether or not it is some improvement? Well, it's like any other question that when the record is undisputed that there is some benefit, as opposing counsel has conceded, there's no need for a jury trial because there's no genuine issue of material fact. There could obviously be cases where there would be. And, indeed, in Allied itself, the court said, opposing counsel makes various arguments based on intent, which, number one, we think is if you look at the actual evidence, it doesn't support their characterizations. But, number two, Allied said that's irrelevant. Even in Allied, there was actual, undisputed evidence of anti-competitive intent. They made this change in order to block competitors, which is not the case here, and yet the court said that doesn't matter. They said the only kind of intent that would matter would be if the intent showed, if they had internal documents saying, we don't really think this is an improvement. We're just going to do this as a way to try and defeat competition because it's not actually providing a benefit for consumers. That would obviously undercut the claim of product improvement. So can I go back to, okay, we have that you think a benefit gives you the improvement. I want to go back to how we know whether the improvement captures the alleged associated conduct or not, whether it's separate or not. Right. So can we go back to the idea about whether you could achieve helping the competition with zero extra cost to the defendant? I think you were saying it still doesn't matter as long as there's improvement. It's just total immunity and we consider it. Can you tell me what you think the answer is to how we know? Yeah, the court obviously does not have to decide that question here. Well, I think we do. Tell me what you think the test is. Well, I think the test is how did the innovator decide to improve the product because judges and juries are not better positioned, the cases say, than innovators to decide how best to improve their product. And then we look at what the other side claims is what injured them and decide, well, was that part of the way to improve the product or was it separate and apart from that? And how do we decide whether it's part of or not separate and apart? What do we look at? What's the question? Well, you look at the logical outflow of the improvement itself and what went into making that improvement as opposed to something that just happened at the same time but isn't actually part of the process of whatever that improvement is. But this is sort of neither because it's the result of something that preexisted and that they didn't change. So it's not part of the improvement and it's not – I forget what your other category was – it's just a background thing that was already there. I don't think that's right, Your Honor, because they're not complaining. They were never complaining about the way the API was structured before. What they're complaining about is the denial. It wasn't affecting them before, but now it is. Here's another hypothetical. I mean, suppose that this was not the background structure, that before this new product, they did allow access by consumers and by app developers either through some toggle way or simultaneously to more than one set of this kind of data at a time, and they changed that when they did the product improvement and blocked it off. Would that be different? Oh, yes, completely different. And I tried to make this point earlier, but I'm not sure I was able to convey it clearly. That's a key difference because in your hypothetical, there's some improvement and there's then additional conduct that's not part of the improvement. It's not something that is necessary or integral to the improvement itself. It's separate conduct that has an alleged anti-competitive effect. Here, there is no separate conduct. All they did is take the old algorithm, come up with a better way to do it, and substitute in the new one for the old one. That's the improvement itself. They're not saying you did something else beyond that. They're saying we want you to do something else beyond that, namely change your product in order to give something that you never gave before. That's true, and I don't know why that's not entirely separate, and I trust Section 2 analysis that has nothing to do with the product improvement. Because Allied involved that very scenario and said it doesn't work. But anyway, Your Honor, I know you don't think the product improvement doctrine applies here. It's not that I don't think it applies. I think it's capital, and it doesn't have directly to do with what they're challenging now. Well, I submit that the policy underlying the product improvement doctrine requires its application in the scenario you're talking about because otherwise you're going to be forcing innovators to defend their product improvements against all sorts of claims like this. But separate and apart from that issue, leaving product improvement doctrine completely aside, if it's not a product improvement case, it's a refusal-to-deal case. Their claim is you're not giving us something in our relationship, our ongoing business relationship, contractual relationship as app developer and data supplier. You're not giving us something that we want, an input that we want for our product to enable us. That is a classic, absolutely classic refusal-to-deal claim, and this Court in precedence, Qualcomm and many other cases, completely foreclosed it. Indeed, they don't even argue to the contrary in their reply brief. They do not even claim that they can make out a refusal-to-deal claim. Their only response is, well, this is an essential facility claim, a doctrine the Supreme Court has never adopted. This Court has never found satisfied that they waived at the motion-to-dismiss stage and only tried to reinsert into the case after the close of discovery, which they shouldn't be permitted to do. But in any event, as Your Honor pointed out, it fails on its face, because as this Court said in the Metronet case, for there to be an essential facility, first and foremost, it has to be essential to competition in the relevant market. And by their definition of the relevant market, the only product in the relevant market is Apple's IRN feature, which does not use HARPO, which they define as the essential facility. So if the only product in the market doesn't use the alleged essential facility to compete, by definition it's not an essential facility because it's not necessary to compete. And indeed, not only is it not essential since the IRN feature doesn't use it, the IRN feature does use, as I said before, the tachygram algorithm, and Apple provides that information to any app developer that wants it. So can I ask, it seems like your answer now to the test for whether something is part of the improvement has something to do with whether something additional would need to be created. You seem to acknowledge that if it's shutting off something that exists, that could count as associated conduct. So I'm taking it that your answer has something to do with creating something new? Well, I think certainly if you can do the product improvement without creating the new thing, and it's clear you would have to create the new thing in order to do the product improvement and give them what they want, then it seems that clearly is not something that should be a basis for liability. It appears that creating something new is essentially creating the switch. There's no switch, and so creating the switch. You're saying no matter how expensive it would be to create the switch, we just never have to create the switch. Is that your argument? Yes, because again, Allied and Foremost and CalComp all say the monopolist does not have to change its product to help its competitors. And so they say it's undisputed that creating the switch would be de minimis. Like they say, their expert said it would have been really easy. It would cost almost nothing, or maybe they even say almost nothing or nothing. No, no, no. It's undisputed that there would be costs, both in terms of having to recode the architecture, but also in terms of, I mean, keeping two algorithms on the phone, I mean, on the watch indefinitely takes more memory. Okay, but their expert says it's de minimis cost. All of those things are. He said, quote, insignificant, and he was unable to quantify the cost. Okay, but then they say, sorry, wait, wait, wait. They say it was insignificant, and they said today your expert never contested that. Can you point me to where your expert contested it? Well, there's ample evidence about the cost, so I'll give you a few examples. I mean, there's a lot of evidence. But I guess my first point would be, since it's undisputed that there would be costs, that should be the end of the case. I understand that's your argument, and maybe that's a good argument, that any cost to do anything new is just enough. It's not pretext. It's enough. But where is your thing saying it's more than de minimis? So the disadvantages of doing what they want are multiple. So first of all, Apple has an interest in providing the most accurate data that it can. No, no. I want to know where your expert says the cost of creating the switch would be more than de minimis in terms of battery life, processing, or engineering time. Where is something that says it's actually a lot of costs? Well, again, neither side quantified it. There's ample evidence from our witnesses that there would be costs.  881 to 882 of the supplemental excerpt of record. At 1924 to 1925 of the excerpt of record, the fact that doing what they want would cause additional battery power and processing power costs, that's at SER 884, excerpt of record 2054. But the record is that for at least several years, the old technology was on them. Yes. And, again, the process of technological innovation often proceeds step by step. And when they first developed – Okay. So, I mean, but we're looking at a damages claim for some period of time. So at least for some period of time, it doesn't appear that the battery life issue was an issue. Again, because they couldn't fully implement the product improvement until they had fully perfected the HERN algorithm, the new algorithm. They kept the old one around. So we're only looking for the period from the time they actually took the old technology off the watch. But there's no basis for liability because, again, they had already improved it. I'm not talking about the basis of liability. I'm talking about the pertinence of this expert assertion that there's a battery life issue here. So even during the time when Harpo was still on the machine and being used, if necessary, only during the first 60 seconds, the evidence is that by not continuing to run it the whole time and store its output, they were saving memory space, which was significant. But it's true, obviously. As long as Harpo was still on the machine, they were still using memory space for that. That's why the goal was ultimately to get rid of it. As an Apple witness testified, this is at 38, 35 to 36 of the excerpt of record, he said, the system is extremely constrained in terms of memory, so we were trying very hard to free up memory in particular to add more features. Harpo was taking up quite a lot of space, and that's why they were trying to get rid of it. So even the ultimate removal of Harpo in itself is a further benefit and also just part and parcel of the reason. Back to the cost of – well, okay, I guess you're saying it's not just the creation of the switch. It's the other stream of data would have this space. You're saying – You're taking up space on the watch. You're taking up processing power. You're taking up energy – So you're saying there's qualitative – there are qualitative quotes like that that say it's some processing, it's some battery, and there's some programming cost, but we never – it never gets quantified. Correct. And they say, oh, well, who cares? It's insignificant. But the point is – No, wait, wait, wait. Can I just ask – we're past – like, we've got the expert reports we have. So if we were to say that a jury has to determine – and you might not like this test, but if a jury had to determine whether the cost was more than de minimis, are you going to be able to – what would you do if we said that was the test? Are you going to just lose then? Or now we're in the section two analysis because you haven't succeeded in showing it's part of the improvement. Would you ask for more discovery? What would we do if we have a test that says you have to show it's more than de minimis? Well, what you would do is you would send every product improvement case to a jury and defeat the entire purpose of the doctrine, which is to incentivize innovation and not force innovators to try to prove to an antitrust jury that the way they did it was better than the way some expert came up with a better way to do it. The whole point of this is that antitrust juries are not well-equipped to make innovation decisions and decide how innovators should best try to make the best product they can for the market. And threatening innovators with treble damages liability every single time they make an improvement would be disastrous for the American economy and totally turn antitrust law upside down. Okay, so that's your argument – very good argument for why we shouldn't say the test is – but I guess just as a practical matter for this case, if we said that was the test, you'd ask to reopen discoveries. Your expert would give more of an analysis of that question, and that's the way these cases would proceed also in the future. I mean, I'm not a trial lawyer. I don't know how that would happen. That's one possibility. But, you know, at the end of the day, their expert claims it's insignificant, and if that's enough to create a jury issue, it's very easy to find experts who can say costs are insignificant if they don't even have to quantify what the cost – insignificant, what does that mean? It doesn't have any content. It's just an assertion of an opinion. If that's enough to get to a jury, every one of these cases goes to a jury. I guess they didn't quantify it either. They just said it was de minimis. They didn't say it's this many dollars either. No one quantified it. That's correct. And, again, what this court said in Allied is not, oh, well, let's look at how much it would have cost to do what the plaintiffs say you should have done. They said it doesn't matter, because even a monopolist has no obligation to change his products to assist his competitors. And, again, as I was suggesting to Judge Berzon, even if the court is concerned about how the product improvement doctrine should apply in this case, this is a refusal to deal case. Not every product improvement case is a refusal to deal case. Many are not, right? But here we have an ongoing contractual business relationship between Apple and AliveCorps. They're in the App Store. They're developers. They have a license agreement, a contractual relationship. They pay their $99 a year fee to be an app developer. And they're saying, as part of our ongoing business relationship, you have an obligation to give us more than what you're giving us because we want it. That is a refusal to deal case. Can I ask what your response is to the intent evidence? Yes, Your Honor. So the intent evidence, if you actually look at that evidence, it doesn't show in any intent to drive AliveCorps or Cardiogram out of business. To the contrary, they are expressing concern that they think. Okay, wait. Sorry. Let me be more specific. What do we do with the intent evidence that Apple wanted to keep the, I guess, I don't know if market is the right word, but keep the business of doing AFib detection so that it could make money from health insurers in the future, I think would be how you read the email that says that. Yes. What do you do with that? So that email was written by Mr. Cha. And he testified in his deposition where he suggested let's hold back the data and we could make lots of money from our new algorithm once it comes out for the IRN feature. He said in his deposition, I'm not aware of any algorithm held back as a means to monetize algorithms at Apple. This is a debate that obviously I was a proponent of, but I eventually lost. The consensus was we should make sure all of this data is available to consumers in HealthKit, period. And Apple's policy, that's at ER 2961 and 2962. Apple's policy, this is at SDR 871. Apple has made a policy decision that it provides health data to users for free. It believes the data belongs to the users. So it's not monetizing it. It's providing it free to users, and users are free to allow app developers to use it if they choose. So one Apple employee or two in email exchanges were speculating years ago they might be able to do this. Apple has not done it. It's against its policy to do it. So I guess your answer is we just ignore it because it's been contradicted. But say we don't ignore it. Say that deposition to Hestimony didn't exist. Do you have any argument about how the legal framework works for thinking about this kind of intent evidence? I mean, say we just had the email that said we wanted to keep this data for ourselves to sell to health insurers in the future. Are you saying that would be relevant if it wasn't contradicted? That should be part of the test at what stage? Two responses. Number one, what that evidence is talking about is not HARPO. It's not talking about HARPO, the algorithm that they're complaining about being withdrawn. It's talking about the tachygram algorithm, the tachygram algorithm data that Apple freely provides to developers through the tachygram API. Okay, well, let's assume it's not that. Let's assume you have an email that says we're cutting off HARPO data because we want to someday be able to sell this to health insurers. Right. What this court said in Allied Orthopedic at page 1001 is, quote, statements of an innovator's intent to harm a competitor through genuine product improvement are insufficient to create a jury question. So that's the law. So even if there were such intent here, and there isn't for the reasons that I just stated, but even if there were, it would not create a jury question. How does that make sense? I understand it's a real sentence there, but when you talk about it being pro-competitive to have a product improvement, that seems to be contradicted if there's no competition. If the whole point of doing it is to eliminate competition, why is it pro-competitive? Well, in Allied, and also here, remember, we're talking about an aftermarket and a foremarket. Allied was competing with other monitor sellers.  I'm just asking conceptually. I mean, that sentence doesn't seem to depend on this variegated market. It just says that whenever you have a product improvement, even if the intent is to foreclose competition, that doesn't matter. Does that make any sense? Again, this case is very different from the hypothetical I think we're discussing. But, yes, I think it does make sense because, as was suggested earlier, it's very common in antitrust cases to find statements in emails and internal correspondence about intent to harm competitors. If that's what competition is designed to, I mean, that's just kind of inherent in competition. But it's inherent in competition if there is competition. If you have a market in which there's no competition, and you're trying to make sure that there remains no competition, then why isn't the intent to make sure that there is no competition a relevant consideration? I think the theory of all the cases that have created and expanded upon the product improvement doctrine is that innovation, encouraging innovation, is one of the goals of the antitrust laws. And we ought not, therefore, have allowed the doctrine to disincentivize innovation by making it easy for plaintiffs, typically plaintiffs trying to profit off of legacy technology, as here, to get to an antitrust jury and threaten treble damages every time an innovator innovates by adopting a product improvement. So the courts have said, if it's actually improvement, if it actually provides some benefit to consumers, we're not going to go down that road. And that may, in certain circumstances, not this one, but in certain circumstances, that might mean that you are not imposing a liability in a way that might deter something that could have some harmful effects. The doctrine recognizes that even if competitors are harmed, there's no liability. But the point of the doctrine is to achieve the policy goal of ensuring that the antitrust laws, particularly with treble damages liability, do not over-deter valuable, beneficial, pro-competitive conduct like product improvement. It's not pro-competitive. That's my problem. It may be beneficial in some abstract way, but in my hypothetical, it's not pro-competitive. Innovation, Your Honor, the courts have said, the Supreme Court has said, innovation is pro-competitive. That's one of the goals of the antitrust laws. So you're saying just giving consumers something new counts as pro-competitive, even if it's not increasing the number of companies providing benefits? Just providing a better benefit is pro-competitive in the relevant sense, is your argument? I think that's right. Can you just explain? So in your view, I think you were kind of getting at this earlier about what was going on with the technology and allied that, like, there's something that was considered part of the improvement that was also arguably anti-competitive and something else that was considered the associated conduct. Can you just walk us through for a second your understanding of the sensors and monitors, or is it too confusing to do that? But are you able to tell us what was part of the improvement that was alleged to have been anti-competitive and then what was considered the associated conduct and how they were different? Well, I don't think there was any – I think this goes to the two-paragraph thing you were talking to Judge Berzant. You started to say it, and I just wondered what you were saying. Yeah, I mean, I guess I don't have an understanding that there was any associated conduct. I think in Tyco there was no associated conduct. There were claims of associated conduct, and the court said no. Well, that's not right because they say the associated conduct argument failed because it was a 45 percent of the sales were still to the other. Well, I mean, it may be difficult to – I mean, there may be some ambiguities here. I have read the court's analysis of forcing, which is, I think, what you're talking about, because before it goes to the forcing paragraph, the court says there has to be other conduct, right? And I suppose this may be what you're saying. In Tyco, the product improvement was to come out with the new monitor, with the new technology, and the new sensors that matched with the new monitor with the new technology. And then Tyco also separately discontinued its old product. So in that sense, that discontinuation, which was not – I mean, they could have kept selling both, right? There was nothing integral to the new product that meant they couldn't keep selling the old product. So in that sense, they were analyzing the discontinuation separately, right? We don't have that here because remember – No, okay, great. So the discontinuation was what they analyzed separately, but there was part of something you were saying was part of the conduct itself as you understood it that was alleged to have been – Yeah, the incompatibility was part of the product improvement itself, right? And that's what the court said. That's not a basis for liability, even though you could have avoided the incompatibility. That's still not a basis for liability because that's part of the improvement. I'm not sure that answers your question. Yeah, I think we have done our questions. Thank you. Thank you. If there's any questions that you would specifically like me to answer to start, I'd be happy to do so, but I have a couple of points that I would love to rebut. Go ahead. All right, thank you, Judge Berzon. So on this point of discontinuation at the end of Allied Orthopedic, I believe that Judge Berzon has actually hit on one of the key points, one of the key reasons that this district court should be reversed, which is that we do have evidence of a monopolist discontinuing old technology in a way that gave consumers no choice and forced adoption. We have 100 percent market share for Apple in this relevant market, which it does not dispute on this record. Well, the possible difference is that you have this background policy and structure of not providing more than one. Actually, can I respond to that? That was a question during my friend's argument. The record is actually that Apple has a policy of reporting multiple different heart rate algorithms as outputs on the watch simultaneously. It has like eight or something. Seven to eight different heart rate algorithms. The witness that he referred to was a man named Stephen Wado. I asked him, do each of these have a different purpose? And he said, yes, that includes HRPO and HRNN. So that would be a fact question, whether there was such a background policy or structure. But if there were, then this would be something more than simply not discontinuing the prior algorithm because there would have to be a change in this structure. In other words, I understand Allied. You have these physical things and you either sell them or you don't. Right. Here you have to fiddle around some, maybe just a little bit, in order to expose this data. Yes. So the question is, does that matter? I don't know that it does because the old technology was that they reported HRPO outputs to third parties. What they stopped was reporting HRPO outputs to third parties. So the discontinuation of the old technology is— But if they want to do the improvement that I think you haven't disputed is the improvement, add HRNN, the only way to do that without the discontinuing is to create a switch. Yes. But actually, real quick on this point. What the claimed improvement is isn't introducing HRNN, but how HRNN works. That's what they claim is the improvement. Throughout this entire— Well, that's being semantic, right? I mean, basically they're saying exercise mode got better because of HRNN. For fitness and exercise. They've been very careful on that because it's affirmatively worse for medical— Right, but it doesn't matter, right, as long as it's— I mean, I don't think there's any significance of the way— legal significance to what type of improvement is the improvement, really. Well, so first of all, one thing that my friend said was that the language in Allied Orthopedic is about some benefit. It's actually some new benefit. That's the language in Allied Orthopedic. But I don't think you dispute that the exercise mode is better. We do because— Well, it's worse for people with ACEF, but better overall. There's always been two purposes. This is in the record in our opening brief. One is exercise and fitness. One is health monitoring. In fact, they had a specific category of health monitoring apps. AliveCore was one of those. And the question is, is it an improvement when you introduce a new algorithm that they claim provides benefits for one side while keeping the same algorithm in the same AGI? Now you're really throwing me off because I thought your whole structure here is we're not challenging that. What we're not challenging is that—we're not claiming that introducing HRNN was anti-competitive. You're not claiming there wasn't an improvement. Well, we believe there are questions about that. They didn't advertise it. It was so marginal that people didn't notice it. But then you're completely changing the case from what I understood that you were trying to structure in your brief, which is we're not questioning that. We're questioning the decision not to have us—allow us access to the data. Yes, that is what we're challenging. Why are you going into this other thing? Because they're making such a big deal out of it, Your Honor. Because if they're—they convinced the lower courts to kick this case on summary judgment because the lower court accepted that not only are they correct that the product design change is introducing HRNN, not only were they correct that you should not focus on gating off HRPO and that not only should you focus on— that you should—not only that there's evidence of discontinuation forcing adoption of IRNN, that because they claim there's a product improvement, this case goes away and it's immune from the NHS law. So the reason— But your answer is no, it doesn't go away. I mean, that's a much clearer way to think about it. If we start getting into arguments about whether it was a product improvement, I think what happens is exactly what happened in the district court. You get deflected from the real question. I see my time is up, but I agree with you. And that's why we structured our brief the way we did, because we believe that the district court disregarded all the evidence that shows that this is actionable under allied orthopedics' own structure. But that means that, in your theory, they are obligated to create the switch. Yes. And, by the way, on this whole thing about intent, that was in the section on whether you can analyze a product improvement. The quote is actually statements of an innovator's intent to harm a competitor through genuine product improvement are insufficient by themselves to create a jury question. It may just be circular, because it depends whether this is all an improvement or not. And this is why we had such a long conversation about the necessary consequence, because if it is de minimis cost to create this switch, is it genuinely true that, to use my friend's statement, that gating off HRPO was, quote, part of introducing HRNN? And we would need a new test for that. I'm not sure that you – well, I believe that we can operate under the necessary consequence, but recognizing that you'd want to avoid sort of a slippery slope, you might need to articulate what exactly. And what is your response to the idea that experts are always going to say it would have been easy, and so every case goes to the jury? Do you have an answer to that? Well, it's built into the summary judgment standard, genuine dispute. Here, you know, this stuff about memory and battery power, I'm the one who took those depositions. I actually know what those people said, and they said no. There's no reason that – there's nothing that we were prevented from doing by keeping HRPO. Battery power was de minimis. Memory usage, de minimis. Reporting, if you're going to report in the workout mode, all you had to do was have one report at the same time. And we know that's what they did. Apple actually used HRPO after it introduced HRNN for years. So there necessarily has to be a factual inquiry there, yes. We do believe so, yes. And you think you only win if it's de minimis, or you win if it could be more than de minimis under the test? Is the test that it's only de minimis? Yeah. I believe it's an excellent question, really. But I think that you could have situations, context-specific, where it might be more than de minimis. We know, for example, Apple has been adjoined to make certain major changes to the way its App Store operates, where that's more than a de minimis cost, but it is meant to avoid anti-competitive effects from its actions under California state law, of course. And that's a completely different case. However, what we know, and this is where we get into the substantially less restrictive alternative portion of the balancing test, this court already has precedent that addresses that sort of situation. And if you get to that point where the plaintiffs have the burden shifted back to them to prove a substantially less restrictive alternative, there's already ample precedent that addresses that. Thank you, both sides, for the helpful arguments. Thank you. I think we've exhausted our questions. This case is submitted.
judges: BERZON, FRIEDLAND, MENDOZA